United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DARNELL SNOWDEN,

          Petitioner,

  v.

R.J. RACKLEY,

          Respondent.

                              /

No. C 12-03983 SI

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY**

     Darnell Snowden, a prisoner at the Deuel Vocational Institution, filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his 2010 conviction from the Santa Clara County Superior Court.  This matter is now before the Court for consideration of the merits of the petition.  For the reasons discussed below, the petition is DENIED.

**BACKGROUND**

**I.     The Crime**

     Snowden was convicted in Santa Clara County Superior Court of second degree robbery and was found to have personally used a firearm in the offense and to have suffered a prior conviction.  The following factual background is taken from the order of the California Court of Appeal:

On November 19, 2008, defendant was charged by information with second degree robbery (§§ 211, 212.5, subd. (c)), and it was alleged that he personally used a firearm in the commission of the offense (§§ 12022.5, subd. (a), 12022.53, subd. (b)). The information further alleged that defendant had served three prior prison terms (§ 667.5, subd. (b)), and that the conviction underlying one of those terms was a prior serious felony and qualified as a strike (§§ 667, subds. (a) & (b)-(i), 1170.12). The information also contained allegations against codefendant Maurice Shawn Hodge, including a count for second degree robbery.

The trial court granted defendant's request to bifurcate trial on the prior allegations, and defendant waived his right to a jury trial on those allegations. The case proceeded to jury trial on the robbery charge against defendant and his codefendant, Hodge.

*The Prosecution's Case*

On the night of March 31, 2007, an employee at a Mountain View liquor store was working by himself. About 9:15 p.m., a "regular customer" rode his bicycle to the store and observed two African-American males "kind of loitering" nearby. The customer entered the store and went to the soft drink area. The two males who were outside the store then ran in wearing masks and holding semiautomatic guns. One of the males pointed a gun at the customer and ordered him "to the ground." The customer complied and put his face on the floor. The other male approached the employee, pointed a gun at him, forced him to open the cash register, and took money that was in the register and on a shelf below the register. The male who had ordered the customer to the ground took a bottle of gin. The robbers were in the store for a total of 30 seconds to two minutes before exiting. The store employee told the customer that the robbers had left, and then the employee ran out of the store and saw the two robbers jump into a slowly moving car. The employee believed that the car was a gray or green [FN2] four-door sedan, and he was able to write down the last three digits of the license plate number. The vehicle was last seen on Moffett Boulevard heading towards Highway 101.

    FN2. The store employee eventually indicated to the police that the car was olive green.

The employee called the police, and about 9:26 p.m., Mountain View police officers on patrol received a dispatch about the robbery. Mountain View police went to the liquor store and interviewed the employee. The employee knew that approximately $1,105 had been taken, as well as the denominations of many of the bills, because he had counted most of the cash shortly before the robbery. He provided a description of the robbers, including their clothing and shoes. He did not remember anything "distinctive" about the clothing.

Mountain View police broadcast a "be-on-the-lookout" notice to surrounding law enforcement agencies regarding the robbery suspects and their vehicle. About 9:50 p.m., an agent with the Palo Alto Police Department saw a vehicle that matched the description with three occupants. The agent gave chase in his patrol car. Initially, the robbers' vehicle "accelerated at a high rate of speed," traveling approximately 70 miles per hour in a 35 mile-per-hour zone. Eventually the robbers' vehicle "came to an abrupt stop" in the middle of a parking lot at an apartment complex in East Palo Alto. Codefendant Hodge, who was the driver of the vehicle, was held at gunpoint by the police and eventually arrested. Defendant, who fled the vehicle, was chased. He was arrested after he was found hiding in bushes in front of a residence. The third occupant of the vehicle also fled but was never located. Defendant had $1,093 in cash. Hodge had $852.03. No handguns were found.

The customer who was present during the robbery left the liquor store before the police arrived, but the police were able to contact him through a phone number that he had given to the store employee. Within ten minutes of arriving home on his bicycle, the customer received a call from the police. A police officer subsequently came to his house to take a statement. At the house, the officer received "a call over the radio" that contact had been made with a vehicle "matching the description" of the one leaving the scene of the robbery. The officer persuaded the customer to go with him to East Palo Alto to possibly identify the suspects. The officer "stressed the importance of trying to make the identification as . . . close to the actual robbery as possible."

Prior to the in-field show-up, the officer admonished the customer as follows: "We are detaining a person for you to view who may or may not be the person who committed the crime. It is important to keep an open mind. Just because the person is being detained does not mean the person committed the crime. Feel free to ask an officer any questions, but do not talk to . . . any other witness about the identification." The customer indicated that he understood the admonition.

The officer drove the customer to the East Palo Alto location and parked the patrol car. The customer observed that "[a]round the corner down the block" there was "a fairly large amount of police officers" present, most with rifles. According to the customer, "[t]hey were kind of looking at rooftops making sure the whole area was secure."

The customer was in the patrol car when two suspects were separately shown to him. The customer identified the first suspect, defendant, within 11 seconds as the person who had pointed the gun at him. He recognized defendant based on his clothing, which consisted of a dark hooded sweatshirt and baggy blue jeans, and shoes, which were white tennis shoes with a black stripe. He acknowledged that there was nothing about the description of the clothing "that would make it stand out as being unique or unusual." The customer believed that the second suspect, Hodge, was the robber who had confronted the store employee, based on Hodge's clothing and height. [FN3] At trial, the customer was "fairly confident" about the identification that he made on the night of the robbery, based on the "glimpse" that he had when he arrived in the store parking lot, his "glimpse" when the gun was pointed at him, the car license plate, and the "close[] resembl[ance]" of the suspects to the description. He admitted that his knowledge of the suspects' car was based on information that the store employee had written down.

> FN3. Although the customer identified Hodge as the other robber who had entered the store, the prosecutor argued to the jury that Hodge was the driver of the getaway car.

The liquor store employee was separately brought to the East Palo Alto location by the police. The employee initially testified on direct examination that he was told by the police that he was "going to view an individual and [he] may or may not recognize them." [FN4] He later testified on cross-examination that the police told him, "I will take you to a location and you will identify." He eventually stated, in response to a question about whether the police had told him that the robbers may not be present: "I remember police say something, but all of that, you know, details, I don't remember clearly what they said." Regarding the vehicle, the employee testified that the police told him, "You will come to the location to identify the car, to see whether that car is the same car that you saw." A police officer testified that he admonished the employee prior to viewing the suspects that "[t]he people that he will be viewing may or may not be the people who committed the crime. Just because people are being detained and may be in handcuffs does not mean the people committed the crime. It is up to him to decide if he recognizes the people as those who committed the crime." According to the police officer, the employee indicated that he understood the admonition and he had no questions.

**United States District Court**
For the Northern District of California

3

United States District Court
For the Northern District of California

> FN4. The employee was provided with a Vietnamese language interpreter at trial. When the employee spoke to the police after the robbery, he did not have an interpreter and all the conversations were in English. Regarding these conversations, he testified: "If I didn't understand, I ask him again."

The employee recognized defendant and told the police, "[s]ame clothes, same shoes." When the employee was shown Hodge, the employee stated, "'No, not this guy'" and indicated that the robber who had pointed the gun at him was "'thinner.'" At trial, when questioned about Hodge, the employee stated that he did not "remember anybody," he "did not see their faces" when they came to the store, and because he "did not see the faces" he could not "identify anybody."

The employee recognized the vehicle that had been stopped by the police as the one in which the robbers had driven away. The last three numbers on the license plate of the vehicle matched the numbers that the employee had written down regarding the robbers' car. The employee saw inside the car a bright blue mask and a pair of white tennis shoes with orange stripes that he believed had been worn during the robbery. [FN5] He also saw a bottle of gin that was the same brand that had been taken from the store.

> FN5. The customer described one robber as wearing "a black colored mask" and the other robber as wearing a "dark colored mask" to police.

A criminalist from the county crime laboratory testified that with respect to the blue ski mask, the "mouth hold area" had a mixture of DNA from at least three people, and defendant was "included as a possible contributor." Regarding the mixture of DNA found on "scrapings from the eye hole and the nose area" of the mask, defendant was "excluded" as a contributor, meaning that "not enough or any of his DNA [was] present . . . ." Defendant's DNA was on a black knit cap [FN6] and he was "included as a possible contributor" of the DNA mixture on a black mouth and nose mask found in the robbers' vehicle. Hodge was "excluded" as a possible contributor with respect to these items.

> FN6. Neither the liquor store employee nor the customer testified about one of the robbers wearing such a cap, which had a logo for the Raiders football team on it.

*The Defense Case*

Samuel Manuel Arellano was called as a witness for defendant. Arellano has known defendant for many years and described his relationship with defendant in 2007 as "[p]retty much like family." Arellano testified that on March 31, 2007, he and defendant were at a house in East Palo Alto. According to Arellano, defendant left the house about 9:00 p.m. Arellano has two prior convictions for second degree burglary and a prior misdemeanor conviction for battery on a girlfriend or close friend.

Ederana K. Cooper was called as a witness for codefendant Hodge. Cooper and Hodge "grew up together" and she had known him for more than ten years. Cooper testified that Hodge came by her house in Menlo Park to visit their daughter about 8:00 p.m. on March 31, 2007. Cooper had not expected him that evening. Cooper testified that Hodge visited with their daughter and then she put their daughter in bed at 9:00 p.m. She and Hodge subsequently went outside within 15 or 20 minutes, about 9:20 p.m. According to Cooper, they talked outside for about 20 or 30 minutes before Hodge's "ride came back and got him." There were already two people in the car. Cooper saw the driver get in the back seat and Hodge got in the driver's seat and "took off driving the car." Cooper thought it was a "Chevy Malibu or something," but she was not "sure of the car." She also indicated that the color of the car was "silver, gray, or something

like that." Cooper is not aware of Hodge having a vehicle. Cooper has been convicted of possession for sale of drugs, second degree burglary, and petty theft with a prior conviction.

*Jury Verdicts, Findings on the Priors, and Sentencing*

The jury found defendant guilty of second degree robbery (§§ 211, 212.5, subd. (c)) and found true the allegation that he personally used a firearm in the commission of the robbery (§ 12022.52, subd (b)). The jury also found codefendant Hodge guilty of second degree robbery. [FN7]

> FN7. We affirmed the judgment against Hodge in an unpublished opinion. (*People v. Hodge* (June 30, 2010, H034437).)

Before a court trial was held on the prior allegations against defendant, he filed a motion challenging the constitutional validity of one of the alleged prior convictions and seeking to strike the conviction. The court denied the motion. After a court trial on the prior allegations, the court found true the allegations that defendant had suffered a prior serious felony conviction (§ 667, subd. (a)) that also qualified as a strike (§§ 667, subds. (b)-(i), 1170.12), and that he served three prior prison terms (§ 667.5, subd. (b)).

On April 22, 2010, the trial court sentenced defendant to 21 years in prison. The sentence consisted of six years, double the midterm, for the robbery, with a consecutive term of 10 years for the weapon use enhancement, and five years pursuant to section 667, subdivision (a). The court stayed the punishment for one of the defendant's prison priors and struck the punishment for his other two prison priors.

Cal. Ct. App. Opinion; Ans. Ex. F at 2-8

## II.    Procedural History

Snowden appealed and argued that the trial court erred by refusing to give a requested pinpoint jury instruction on whether the show-up identification procedure used by the police was unduly suggestive. The California Court of Appeal affirmed his conviction in a reasoned opinion, and on July 13, 2011, the California Supreme Court denied his petition for review without comment. On January 20, 2012, Snowden filed a petition for writ of habeas corpus in the California Supreme Court alleging insufficient evidence to support his robbery conviction and that the trial court had erred in refusing to strike his prior "strike" conviction. On May 9, 2012, the California Supreme Court denied the petition for writ of habeas corpus without comment.

On September 28, 2012, Snowden, acting in pro per, filed an amended petition for writ of habeas corpus in this Court. The action was stayed while Snowden exhausted state court remedies for several of the claims in the amended petition.

United States District Court
For the Northern District of California

On September 20, 2013, Snowden filed another petition for writ of habeas corpus in the California Supreme Court again alleging insufficient evidence to support his robbery conviction. Snowden also alleged that the guilty plea which became his "strike" conviction was taken from him in violation of his Sixth and Fourteenth Amendment rights and that he was provided with ineffective assistance by both trial and appellate counsel. On December 11, 2013, the California Supreme Court denied Snowden's second habeas petition, again without comment. After Snowden filed notice indicating that he had completed exhaustion, this case was reopened on February 13, 2014. The Court ordered respondent to show cause why the petition should not be granted, finding the following claims cognizable: (1) the trial court erred in refusing to give a requested pinpoint jury instruction on the show-up procedure used to identify Snowden; (2) the evidence was insufficient to support the judgment; and (3) trial and appellate counsel provided ineffective assistance of counsel in the ways specified in the amended petition. Respondent filed an answer and Snowden, now represented by counsel, filed a traverse.

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged conviction occurred in Santa Clara County, California, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. *See* 28 U.S.C. § 2254(b), (c). The parties do not dispute that the state judicial remedies were exhausted for the claims in the petition.

**United States District Court**
For the Northern District of California

## STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

## DISCUSSION

### I.    Failure to Give Pinpoint Jury Instruction

Snowden claims that the trial court violated his due process rights by failing to give a requested pinpoint instruction regarding the in-field show-up. Snowden raised this claim on direct appeal, and the California Court of Appeal rejected it by written opinion. The appellate court held:

> During an unreported conference in chambers, the trial court apparently denied a request by defense counsel to add language to CALCRIM No. 315, which pertains to eyewitness

7

identification testimony.  The court did instruct the jury pursuant to a modified version of CALCRIM No. 315 as follows:

"You have heard eyewitness testimony identifying the defendants.  As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony.

"In evaluating identification testimony, consider the following questions:

"Did the witness know or have contact with the defendants before the event?

"How well could the witness see the perpetrators?

"What were the circumstances affecting the witness'[s] ability to observe, such as lighting, weather conditions, obstructions, distance, and duration of observation?

"How closely was the witness paying attention?

"Was the witness under stress when he made the observations?

"Did the witness give a description . . . and how does that description compare to the defendants?

"How much time passed between the event and the time when the witness identified the defendant?

"Was the witness asked to pick the perpetrators out of a group?

"Did the witness ever fail to identify the defendants?

"Did the witness . . . ever change his mind about the identification?

"How certain was the witness when he . . . made an identification?

"Are the witness and the defendants of different races?

". . . Was the witness able to identify other participants in the crime?

"*Was there a show-up or in-field identification by the witness*?

"*What were the circumstances of that show-up or in-field identification*?

"Were there any other circumstances affecting the witness'[s] ability to make an accurate identification?

"The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime.  If the People have not met this burden, you must find that the defendants not guilty."  (Italics added.)

Outside the presence of the jury, defense counsel placed on the record his objection concerning the instruction. Defense counsel explained that he had requested the addition of the following language to CALCRIM No. 315: "Was the show-up procedure used by the Mountain View Police Department unnecessarily suggestive as to the identity of the defendants here?"  In support of the proposed instruction, defense counsel argued that the "victims were unnecessarily prejudiced" in connection with the show-up.  For example, a victim was taken "across town in a police car" which, according to defense counsel, suggested to the victim that the police had a "serious suspect in the case."

United States District Court
For the Northern District of California

The prosecutor contended that defense counsel's statements were "argument for closing," were not "appropriate for the jury instruction," and that codefendant's counsel had proposed "another alternative and that was allowed in."

The trial court denied defense counsel's request. The court stated that the "proposed language" was "argumentative." The court further stated that defense counsel was not prevented "from arguing anything that he ha[d] said in support of that language." In this regard, the court explained that there were "many-factors under [CALCRIM No.] 315 that he could use in support of those arguments without needing or necessitating the proposed language." The court also observed that defense counsel might rely on the "proposed addition" to the instruction by codefendant's counsel, concerning whether there was a "show-up or in-field identification by the witness" and "the circumstances of that show-up or in-field identification." Defense counsel could also rely on the "catch-all factor" in CALCRIM No. 315 concerning whether there were "any other circumstances affecting the witness'[s] ability to make an accurate identification[.]" The court concluded that "nothing" in the instruction prevented defense counsel from making his arguments concerning an unnecessarily suggestive show-up procedure and that there were "several factors that he could rely on to make those arguments."

. . . .

In this case, we determine that the trial court did not err in refusing to provide defendant's proffered instruction concerning whether the "show-up procedure" used by the police was "unnecessarily suggestive as to the identity of the defendants." The instruction proposed by defendant referred to the potential impact or effect on the eyewitness. Our Supreme Court has cautioned, however, that an instruction "should not take a position as to the impact" of any of the psychological factors listed. (*Wright*, *supra*, 45 Cal. 3d at p. 1141.) Further, the jury was already instructed, pursuant to a modified version of CALCRIM No. 315, to consider whether there was "a show-up or in-field identification by the witness," "the circumstances of that show-up or in-field identification," and whether there were "any other circumstances affecting the witness'[s] ability to make an accurate identification." These factors focused the jury's attention on the show-up procedure and whether it had any effect on the witnesses who identified defendant, and thus the instructions given to the jury necessarily encompassed defendant's requested language concerning the possible suggestiveness of the show-up procedure. The court was not required to give a duplicative instruction. (*Wright*, *supra*, 45 Cal. 3d at p. 1134; *see also Bolden*, *supra*, 29 Cal. 4th at p. 558.)

Moreover, the instructions given to the jury concerning eyewitness identification properly left the effect of the factors to cross-examination and argument by counsel, including the argument that the show-up procedure was unnecessarily suggestive as to the identity of defendant. (*See Wright, supra*, 45 Cal.3d at p. 1143.) Indeed, defense counsel cross-examined the police officers who were involved in the eyewitness identification process about the procedure in general and specifically in this case, including whether certain conduct by the police was too suggestive or otherwise prejudicial to defendant. Defense counsel also attempted to suggest problems with the show-up procedure during argument to the jury after the close of evidence. For example, defense counsel told the jury: "If a police officer says, . . . after you've just been through a traumatic situation like a robbery, 'We want you to get in our car and drive to East Palo Alto and do a viewing,' what are you thinking? Aren't you thinking something like this: 'They told me it may not be there, but . . . these are good policemen. They wouldn't drag me all the way across town for no reason'? And that's the psychology of this thing that I think you need to talk about. Most of us, myself included, if I'm pulled over by a police officer and he tells me, I'm going 45 in a 35 miles an hour zone, . . . I might say, 'Well, I know I was only going 35, but I'm going to tell him he's wrong? Am I going to

1   tell him he's crazy?  Am I going to say anything to disrepect him in any way?'  I don't
2   think that's the average response."

3   In sum, we determine that the modified version of CALCRIM No. 315 that was given
    in this case adequately instructed the jury regarding its evaluation of the testimony
    concerning the show-up or in-field identifications by the witnesses, and the court did not
4   err in refusing to provide defendant's proffered instruction regarding the potential impact
    or effect of the show-up procedure on the accuracy of the eyewitness' identifications.

6   Cal. Ct. App. Opinion, Ans. Ex. F at 8-14

7       A state trial court's refusal to give an instruction does not alone raise a ground cognizable in

8   a federal habeas corpus proceeding.  *See Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988).  The

9   error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the

10  Fourteenth Amendment.  *See id*.

11      Due process requires that "'criminal defendants be afforded a meaningful opportunity to present

12  a complete defense.'"  *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006) (quoting *California v.*

13  *Trombetta*, 467 U.S. 479, 485 (1984)).  Therefore, a criminal defendant is entitled to adequate

14  instructions on the defense theory of the case.  *See Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000)

15  (error to deny defendant's request for instruction on simple kidnaping where such instruction was

16  supported by the evidence).

17      Due process does not require that an instruction be given unless the evidence supports it.  *See*

18  *Hopper v. Evans*, 456 U.S. 605, 611 (1982); *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005).

19  The defendant is not entitled to have jury instructions raised in his or her precise terms where the given

20  instructions adequately embody the defense theory.  *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th

21  Cir. 1996); *United States v. Tsinnijinnie*, 601 F.2d 1035, 1040 (9th Cir. 1979).

22      Whether a constitutional violation has occurred will depend upon the evidence in the case and

23  the overall instructions given to the jury.  *See Duckett*, 67 F.3d at 745.  An examination of the record

24  is required to see precisely what was given and what was refused and whether the given instructions

25  adequately embodied the defendant's theory.  *See United States v. Tsinnijinnie*, 601 F.2d 1035, 1040

26  (9th Cir. 1979), cert. denied, 445 U.S. 966 (1980).  In other words, it allows a determination of whether

27  what was given was so prejudicial as to infect the entire trial and so deny due process. *See id*.

28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

The omission of an instruction is less likely to be prejudicial than a misstatement of the law. *See Walker v. Endell*, 850 F.2d at 475-76 (citing *Henderson v. Kibbe*, 431 U.S. at 155). Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'" *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)). The significance of the omission of such an instruction may be evaluated by comparison with the instructions that were given. *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir. 2001) (quoting *Henderson*, 431 U.S. at 156); *see id.* at 972 (due process violation found in capital case where petitioner demonstrated that application of the wrong statute at his sentencing infected the proceeding with the jury's potential confusion regarding its discretion to impose a life or death sentence).

The Court concludes that the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law. The Court of Appeal reasonably found that the modification to the instructions made by the trial court as requested by codefendant Hodge encapsulated Snowden's request. Snowden asked the trial court to instruct: "Was the show-up procedure used by the Mountain View Police Department unnecessarily suggestive as to the identity of the defendants here?" Ex. B at 471-72. The trial court instead instructed the jury to consider whether there was "a show-up or in-field identification by the witness," "the circumstances of that show-up or in-field identification," and whether there were "any circumstances affecting the witness'[s] ability to make an accurate identification." Ex. B at 458-59. These factors properly focused the jury's attention on the possibility of undue suggestion by the police during the show-up procedure. The instructions given to the jury adequately embodied the defense theory of the case. Snowden argues that the instruction given did not ask the jury whether the in-field identification procedure had any effect on the witnesses who identified him. However, Snowden fails to show that what was given to the jury was so prejudicial that it infected the entire trial and violated his due process rights.

Snowden also argues that although defense counsel was allowed to argue that the show-up was suggestive, the jury could have disregarded that argument because the court instructed the jury: "If you believe that the attorney's comments on the law conflict with my instructions you must follow my instructions." However, the record does not indicate that defense counsel said anything in his closing

United States District Court
For the Northern District of California

1    argument that conflicted with CALCRIM No. 315.  Furthermore, both defense counsel's argument and

2    the CALCRIM No. 315 factors made clear to the jurors that they had to decide whether the show-up

3    procedure was unduly suggestive.

4         Even if the trial court erred in failing to give Snowden's requested instruction in his precise

5    terms, Snowden is entitled to habeas relief only if the error had a "substantial and injurious effect or

6    influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  Here,

7    the error was harmless because there was extensive evidence of Snowden's guilt aside from the show-

8    up evidence.  First, the car from which Snowden fled matched the description of the culprits' vehicle.

9    Second, several items found in that car connected the occupants to the liquor store robbery: a blue ski

10   mask, a black face mask, and a black knit cap worn during the robbery, and an unopened bottle of

11   Tanqueray gin taken from the liquor store.  Third, DNA evidence linked Snowden as a minor contributor

12   to the blue ski mask, as a possible contributor to the black face mask, and as the source to the black knit

13   cap.  Finally, the liquor store employee reported that approximately $1,105 in cash had been taken and

14   Snowden had $1,093 in cash on his person.  It was reasonable for the jury to have reached its verdict

15   without Snowden's requested language in the instruction.  Because it cannot be said that the error by

16   the trial court had a "substantial and injurious effect" on the jury's verdict, Snowden is not entitled to

17   habeas relief on this claim.

18

19   **II.      Insufficiency of the Evidence**

20        Snowden alleges that there was insufficient evidence to support the robbery conviction.  This

21   claim was denied by the state court without a reasoned decision.  This Court must conduct an

22   independent review of the record to determine whether the state court clearly erred in its application of

23   controlling federal law, and consequently, whether the state court's decision was objectively

24   unreasonable.  *Delgado v. Lewis*, 223 F. 3d 976, 982 (9th Cir. 2000).

25        The Due Process Clause "protects the accused against conviction except upon proof beyond a

26   reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re*

27   *Winship*, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the evidence in support of his state

28   conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt

beyond a reasonable doubt therefore states a constitutional claim, *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, *see id*. at 324.  *See*, *e.g*., *Wigglesworth v. Oregon*, 49 F.3d 578, 582 (9th Cir. 1995) (writ granted where Oregon procedure of allowing lab reports regarding drug analyses to be admitted into evidence without authenticating testimony relieved state of its burden to prove beyond reasonable doubt all elements of crime charged); *Martineau v. Angelone*, 25 F.3d 734, 739-43 (9th Cir. 1994) (writ granted where evidence found insufficient to convict defendants of child abuse based on delay in seeking medical care for child).

The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas proceedings . . . ."  *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per curiam) (finding that the Third Circuit "unduly impinged on the jury's role as factfinder" and failed to apply the deferential standard of *Jackson* when it engaged in "fine-grained factual parsing" to find that the evidence was insufficient to support petitioner's conviction).  A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt.  *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992), cert. denied, 510 U.S. 843 (1993); *see*, *e.g*., *Coleman*, 132 S. Ct. at 2065 ("the only question under *Jackson* is whether [the jury's finding of guilt] was so insupportable as to fall below the threshold of bare rationality").  The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at 319).  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, has there been a due process violation.  *Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338; *Miller v. Stagner*, 757 F.2d 988, 992-93 (9th Cir. 1985), amended, 768 F.2d 1090 (9th Cir. 1985), cert. denied, 475 U.S. 1048, and cert. denied, 475 U.S. 1049 (1986); *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th Cir. 1984), cert. denied, 469 U.S. 838 (1984).

After AEDPA, a federal habeas court applies the standards of *Jackson* with an additional layer of deference.  *Juan H*., 408 F.3d at 1274.  Generally, a federal habeas court must ask whether the operative state court decision reflected an unreasonable application of *Jackson* to the facts of the case.  *Coleman*, 132 S. Ct. at 2062; *Juan H*., 408 F.3d at 1275 (quoting 28 U.S.C. § 2254(d)).  Thus, if the state court affirms a conviction under *Jackson*, the federal court must apply § 2254(d)(1) and decide

whether the state court's application of *Jackson* was objectively unreasonable. *See McDaniel*, 130 S. Ct. at 673; *Sarausad*, 479 F.3d at 677-78. To grant relief, therefore, a federal habeas court must conclude that "the state court's determination that a rational jury could have found that there was sufficient evidence of guilt, i.e., that each required element was proven beyond a reasonable doubt, was objectively unreasonable." *Boyer v. Belleque*, 659 F.3d 957, 964-965 (9th Cir. 2011).

By contrast, § 2254(d)(2) is not readily applicable to *Jackson* cases, because a court under *Jackson* makes no "determination of the facts" in the ordinary sense of resolving factual disputes. *Sarausad*, 479 F.3d at 678. Rather, the court views the evidence in the light most favorable to the prosecution without resolving any disputed factual questions. *Id.* The federal court's task is not to decide whether the state court unreasonably determined disputed facts; it is, rather, to decide whether the state court unreasonably applied the *Jackson* test. *Id.*; *see id.* at 683 (finding that while state court's characterization of certain testimony was objectively unreasonable, its conclusion that the *Jackson* standard was satisfied was not objectively unreasonable). Thus, a federal court evaluates a state court's resolution of a *Jackson* sufficiency of the evidence claim in all cases under § 2254(d)(1) rather than § 2254(d)(2). *Id.* at 678.

In sum, sufficiency claims on federal habeas review are subject to a "twice-deferential standard." *Parker v. Matthews*, 132 S. Ct. at 2152 (2012) (per curiam). First, relief must be denied if, viewing the evidence in the light most favorable to the prosecution, there was evidence on which "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson*, 443 U.S. at 324). Second, a state court decision denying a sufficiency challenge may not be overturned on federal habeas unless the decision was "objectively unreasonable." *Id.* (quoting *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011)).

Sufficiency claims are judged by the elements defined by state law. *Jackson*, 443 U.S. at 324 n. 16. Under California law, for the criminal offense of robbery the jury must find that: (1) defendant took property that was not his own; (2) defendant took property from another person's possession and immediate presence; (3) defendant took the property against that person's will; (4) defendant used force or fear to take the property or to prevent the person from resisting; and (5) when defendant used force

1    or fear to take the property he intended to deprive the owner of it permanently. *See* Cal. Penal Code §
2    211.

3         Snowden argues that the identification by the liquor store employee and customer was
4    insufficiently reliable to link him to the crime. Specifically, Snowden notes that both perpetrators were
5    African-American, neither victim was African American, both perpetrators wore masks and a very
6    common type of clothing, the victims could not identity Snowden or his codefendant at the time of the
7    trial, and the store employee only recorded three numbers of the getaway car's license number.
8    However, after an examination of all of the evidence submitted at trial in the light most favorable to the
9    prosecution, the Court concludes that a rational trier of fact could have found the essential elements of
10   the crime beyond a reasonable doubt. The record shows that the employee identified Snowden during
11   the show-up procedure as the robber who had ordered the customer to the ground. The employee
12   recognized Snowden's clothing and shoes. Ex. B at 226-230, 246-48. The employee did not recognize
13   Hodge, telling police that Hodge was not the man who had pointed a gun at him. *Id*. at 230. The
14   customer also identified Snowden during the show-up procedure as the man who had ordered him to the
15   ground, specifically recognizing Snowden's shoes. *Id*. at 178-79. In addition, the employee recognized
16   the car Hodge had been driving, which matched the color and last three digits of the license plate
17   number he had taken down, as the getaway car. *Id*. at 82, 231. When the employee looked inside the
18   car, he saw the bottle of Tanqueray gin he said Snowden had stolen, as well as the bright blue ski mask
19   that he said Snowden had worn. *Id*. at 83, 102-103, 113-14, 136, 231-33, 252, 410-11. The results of
20   the DNA test included Snowden as "a possible contributor" of the DNA found on the "mouth hole area"
21   of the blue ski mask. *Id*. at 299-303. Furthermore, the jury was presented with evidence that Snowden
22   fled from the police, was found hiding among bushes in front of a residence, and had $1,093 in cash on
23   his person. *Id*. at 191-92, 199-200, 263-64, 277. There was sufficient evidence for the state court to
24   reasonably conclude that a rational trier of fact could have found Snowden guilty of robbery beyond a
25   reasonable doubt.

26        Snowden also argues that there was insufficient evidence to support the finding that he used a
27   firearm because the prosecution did not physically produce a firearm and relied on "hearsay" evidence
28   from the victims. However, under California law the prosecution is not required to produce the weapon

1  for the jury to find that petitioner personally used a firearm during the commission of the crime.  *See*

2  *People v. Mendez*, 188 Cal. App. 4th 47, 58-59 (Ct. App. 2010) (sufficient evidence supported finding

3  the defendant personally used a firearm during the robbery when the victim "testified that the person

4  who approached him with the gun was wearing a baseball cap and black shorts" and the evidence

5  demonstrated that defendant was wearing black shorts when the police saw him flee the scene and a

6  baseball cap was recovered from where defendant was hiding).  Here, the store employee and the

7  customer both testified that Snowden personally used a gun during the robbery.  Ex. B at 125, 140-45.

8  The jury's credibility determination regarding the testimony of the store employee and the customer is

9  "entitled to near-total deference under *Jackson*."  *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004)

10  Except in the most exceptional of circumstances, *Jackson* does not permit a federal habeas court to

11  revisit credibility determinations.  *See id*.  Therefore, this Court will not revisit the jury's credibility

12  determinations.

13      As to Snowden's argument that the victims' testimony was inadmissible hearsay evidence, he

14  is mistaken.  Hearsay evidence is "evidence of a statement made other than by a witness while testifying

15  at the hearing and that is offered to prove the truth of the matter stated."  *See* Cal. Evidence Code

16  § 1200(a).  Testimony from the robbery victims that the defendant used a gun during the robbery is not

17  hearsay evidence.

18      The state court did not unreasonably apply clearly established federal law and its denial of

19  Snowden's claim was not objectively unreasonable.  Snowden is not entitled to habeas relief on this

20  claim.

21

22  **III.    Ineffective Assistance of Counsel**

23      **A.    Trial Counsel**

24      Snowden alleges that he received ineffective assistance of trial counsel because (1) counsel

25  failed to object to the prosecution pursuing and obtaining a gun-use enhancement without physically

26  producing the gun in court; (2) counsel failed to object to the inadmissible hearsay from the victims of

27  the robbery concerning Snowden's use of a gun; (3) counsel failed to object to the flawed identification

28  procedure; and (4) counsel, in moving to strike Snowden's prior "strike" conviction, failed to prepare

and include a declaration by Snowden about what he was told and understood about the plea involving strikes.   Snowden raised this claim in his state petition for writ of habeas corpus, which the California Supreme Court summarily denied.

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984).   The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.  *Id*.  The right to effective assistance of counsel applies to the performance of both retained and appointed counsel without distinction.  *See Cuyler v. Sullivan*, 446 U.S. 335, 344-45 (1980).

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things.  First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms.  *Strickland*, 466 U.S. at 687-88.  Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Id*.

The *Strickland* framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis.  *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Williams*, 529 U.S. at 404-08.  A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254.  *See Pinholster*, 131 S. Ct. at 1410-11; *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (same); *Premo v. Moore*, 131 S. Ct. 733, 740 (2011) (same).  The general rule of *Strickland*, i.e., to review a defense counsel's effectiveness with great deference, gives the state courts greater leeway in reasonably applying that rule, which in turn "translates to a narrower range of decisions that are objectively unreasonable under AEDPA."  *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  When § 2254(d) applies, "the question is not whether counsel's actions were reasonable.  The question is whether there

1  is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 131

2  S. Ct. at 788.

3       The Court concludes that petitioner has not shown that trial counsel was ineffective.  As noted

4  above, the prosecution was not required to produce the weapon to prove personal use of a firearm, and

5  the victims' testimony that the robbers pointed guns at them is not hearsay evidence.  The state court

6  correctly rejected these contentions as counsel was not ineffective for failing to make meritless

7  objections.

8       With regard to Snowden's claim that counsel failed to object to the flawed identification

9  procedure, he cannot show that he was prejudiced by counsel's performance.  Snowden argues that if

10 the trial court had been given the opportunity to review the identification for undue suggestiveness, the

11 court would have ruled in his favor and stricken the identification.  Assuming arguendo that the

12 identification procedure was flawed, the Court has determined that there was extensive evidence beyond

13 the identification evidence for a rational trier of fact to reach the verdict.  Snowden fails to show how,

14 but for counsel's failure to object to the identification procedure, there is a reasonable probability that

15 the result of the trial would have been different.

16      Snowden also failed to show prejudice based on trial counsel's failure to prepare a declaration

17 by Snowden about what he was told and understood about the plea involving strikes.  Snowden argues

18 that it was impossible for the trial court to make a ruling without this information.  However, the record

19 clearly indicates that at the hearing on the motion to strike the "strike," the court made clear that it had

20 reviewed trial counsel's moving papers, the prosecution's opposition, and the transcript of the 2001

21 proceedings.  Ex. B at 583.  The transcript of the 2001 plea proceedings showed the court advising

22 Snowden that his plea to the charge would result in a conviction that would constitute a "strike"

23 conviction for future purposes.  Ex. A at 325.  After being so advised by the court, Snowden responded

24 affirmatively.  *Id*.  The trial court rejected counsel's argument that Snowden did not knowingly and

25 voluntarily plead guilty to a "strike."  Ex. B at 588-91.  Snowden fails to show how a declaration or

26 testimony by him to the trial court would have changed the result of the proceeding.

27

28

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    Accordingly, the state court's rejection of Snowden's ineffective assistance of counsel claim was

2    not contrary to, or an unreasonable application of, Supreme Court precedent.  Snowden is not entitled

3    to habeas relief on this claim.

4

5    **B.    Appellate Counsel**

6    Snowden alleges that it was ineffective assistance of appellate counsel to fail to make an

7    insufficient evidence claim on direct appeal.  Snowden argues that appellate counsel refused to raise this

8    claim not because of tactics or strategy, but because appellate counsel determined the issue was "very

9    difficult."  Snowden also alleges that it was ineffective assistance of appellate counsel to not raise other

10   issues on appeal, such as the ineffective assistance of trial counsel, Snowden's guilty plea to the crime

11   that became a "strike" conviction, the gun and hearsay testimony, and the identification procedure.

12   The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the

13   effective assistance of counsel on his first appeal as of right.  *Evitts v. Lucey*, 469 U.S. 387, 391-405

14   (1985).  Claims of ineffective assistance of appellate counsel are reviewed according to the standard set

15   out in *Strickland v. Washington*, 466 U.S. 668 (1984).  *Smith v. Robbins*, 528 U.S. 259, 285 (2000);

16   *Moormann v. Ryan*, 628 F.3d 1101, 1106 (9th Cir. 2010); *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th

17   Cir. 1989).  First, the petitioner must show that counsel's performance was objectively unreasonable,

18   which in the appellate context requires the petitioner to demonstrate that counsel acted unreasonably

19   in failing to discover and brief a merit-worthy issue.  *Smith*, 528 U.S. at 285; *Moormann*, 628 F.3d at

20   1106.  Second, the petitioner must show prejudice, which in this context means that the petitioner must

21   demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, the

22   petitioner would have prevailed in his appeal.  *Smith*, 528 U.S. at 285-86; *Moormann*, 628 F.3d at 1106.

23   It is important to note that appellate counsel does not have a constitutional duty to raise every

24   nonfrivolous issue requested by defendant.  *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983); *Gerlaugh

25   v. Stewart*, 129 F.3d 1027, 1045 (9th Cir. 1997); *Miller*, 882 F.2d at 1434 n.10.  The weeding out of

26   weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy.  *See id.* at

27   1434.  Appellate counsel therefore will frequently remain above an objective standard of competence

28

United States District Court
For the Northern District of California

and have caused his client no prejudice for the same reason – because he declined to raise a weak issue. *Id*.

The Court has found, as noted above, that it was not objectively unreasonable for the state court to reject Snowden's insufficient evidence claim. Appellate counsel's decision not to raise this weak claim on direct appeal does not demonstrate that his performance fell below an objective standard of competence. Consequently, appellate counsel did not cause Snowden any prejudice. As to the claim that appellate counsel failed to raise other issues on appeal, it was not objectively unreasonable for appellate counsel to weed out weaker issues and to focus on those more likely to prevail. Snowden did not suffer any prejudice from counsel's failure to raise these other issues for the reasons set forth above. Accordingly, Snowden is not entitled to habeas relief based on this claim.

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is DENIED. A certificate of appealability will not issue. Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Snowden may seek a certificate of appealability from the Ninth Circuit Court of Appeals. The clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

Dated: August 11, 2014

_____
SUSAN ILLSTON
UNITED STATES DISTRICT JUDGE